1   JOHNSON & WEAVER, LLP
    Frank J. Johnson (SBN 174882)
2   frankj@johnsonandweaver.com
    Shawn E. Fields (SBN 255267)
3   shawnf@johnsonandweaver.com
    110 West "A" Street, Suite 750
4   San Diego, CA 92101
    Telephone: (619) 230-0063
5   Facsimile: (619) 255-1856

6   Attorneys for Plaintiff

7

8

9                        **UNITED STATES DISTRICT COURT**

10                      **NORTHERN DISTRICT OF CALIFORNIA**

11   STEVE SHANNON, derivatively on behalf        Case No.:
     of AMYRIS, INC.,
12
                      Plaintiff,
13
                  v.                              **VERIFIED SHAREHOLDER**
14                                                **DERIVATIVE COMPLAINT**

     JOHN MELO, ARTHUR LEVINSON,
15   RALPH ALEXANDER, PHILIPPE                    DEMAND FOR JURY TRIAL
     BOISSEAU. L. JOHN DOERR,
16   GEOFFREY DUYK, SAMIR KAUL,
     PATRICK PICHETTE, CAROLE
17   PIWNICA, KEITH KINKEAD REILING,
     FERNANDO REINACH, NEIL
18   RENNINGER, PETER BOYNTON, JOEL
     CHERRY. JERYL HILLEMAN,
19   JEFFERSON LIEVENSE, TAMARA
     TOMPKINS, and MARIO PORTELA,
20
                      Defendants,
21
     -and-
22
     AMYRIS, INC., a Delaware corporation,
23
                      Nominal Defendant.
24

25

26

27

28

                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**FILED**

AUG 0 8 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EDL

CV 13 3694

1    By and through his undersigned counsel, Plaintiff Steve Shannon ("Plaintiff") brings
2    this shareholder derivative action on behalf of Amyris, Inc. ("Amyris" or the "Company") and
3    against certain current and former officers and directors of the Company for breaches of
4    fiduciary duties, unjust enrichment, corporate waste, insider trading, and aiding and abetting
5    thereof. Plaintiff makes these allegations upon personal knowledge as to those allegations
6    concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which
7    includes, without limitation: a) review and analysis of public filings made by Amyris and other
8    related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b)
9    review and analysis of press releases and other publications disseminated by certain of the
10   Defendants and other related non-parties; c) review of news articles, shareholder
11   communications, and postings on Amyris's website concerning the Company's public
12   statements; and d) review of other publicly available information concerning Amyris and the
13   Individual Defendants (defined below).

14   **I.    INTRODUCTION**

15   1.    Amyris is a renewable products company focused on providing alternatives to
16   petroleum-sourced products. Amyris uses patented engineered microbes to convert plant-
17   based sugars into renewable chemicals, which are then used in products such as transportation
18   fuels, lubricants, cosmetics, fragrances and flavorings.

19   2.    Amyris's focus has been on a particular renewable chemical trademarked as
20   Biofene™. Among other uses, Biofene can be used in biodiesel and other transportation fuels.

21   3.    In order to compete with oil and other traditional fuel sources, Biofene would
22   need to be created and sold in large quantities and at competitive prices. Amyris forms joint
23   ventures with other chemical producers in order to produce Biofene at their facilities.

24   4.    On February 22, 2011, the Individual Defendants caused Amyris to announce
25   that the Company had successfully completed multiple runs of Biofene in 100,000 and
26   200,000 liter capacity fermenters, and that the Company expected to commence commercial
27   production of Biofene in the second quarter of 2011, through manufacturing agreements with

28   _____1_____
     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  entities including Biomin and Tate & Lyle. The Individual Defendants further caused Amyris

2  to announce that the Company had entered into additional joint venture agreements with other

3  entities.

4      5.      On April 29, 2011, the Individual Defendants caused Amyris to announce that

5  the Company had successfully completed an industrial-scale facility in Brazil, to allow the

6  Company to continue sustained commercial production of Biofene.      Additionally, the

7  Company would scale its production of Biofene through contract agreements with

8  manufacturers in Brazil, Europe, and the United States.

9      6.      On May 5, 2011, during the Company's first quarter 2011 earnings call with

10  investors and financial analysts, the Individual Defendants continued to assure investors that

11  Amyris could produce Biofene on a commercial scale. Defendant John Melo ("Melo") stated:

12      We expect these five facilities to produce 200 million liters at target production
        efficiency and we believe that the demand potential represented by our
13      distribution partners and current off-take agreements is over $1 billion at annual
        sales by 2013.   Further, we expect to add to this portfolio of off-take
14      agreements substantially during the remainder of this year with active
        discussions underway with customers representing an additional $400 million
15      to $600 million in annual revenue potential.

16

17      7.      However, the Individual Defendants had no reasonable basis for this timeline or

18  their repeated optimistic statements about Biofene production, because of known, systematic

19  problems with production operations.

20      8.      Despite this knowledge, the Individual Defendants continued to cause Amyris

21  to assure investors that Biofene production was operating smoothly. On August 2, 2011,

22  during the Company's second quarter 2011 earnings call with investors and financial analysts,

23  Defendant Melo stated that the Company's production plants had ramped up quickly and were

24  delivering 99% of target production volume. Defendant Melo also repeated the claim that the

25  Company expected the five production facilities together to produce over 200 million liters a

26  year.

27      9.      However, on November 1, 2011, the truth began to be revealed. For the first

28  time, Defendant Melo indicated that there were problems with production, and revealed that

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  "we decided to slow down our production ramp this year to produce a total of 1 million to 2

2  million liters of farnesene and achieve a year-end run rate in the range of 700,000 liters of

3  production a month."

4      10.    On this news, Amyris's stock fell 20% in one day, from $19.36 per share on

5  November 1, 2011, to close at $15.47 per share on November 2, 2011. By November 4, 2011,

6  the stock had fallen to $14.05 per share.

7      11.    On February 9, 2012, the Individual Defendants finally caused Amyris to admit

8  that production would be much lower than investors had been told. Defendant Melo stated

9  that Amyris would not be completing the expansion of one of its 100 million liter plants, and

10 stated:

11        Given the lower plant volume, we are no longer adhering to our previously
   announced plan to produce 40 million liters to 50 million liters of Biofene in

12        2012. Second, we are no longer forecasting positive cash flows from
   operations in 2012. To cover this gap, we are raising additional equity

13        financing.

14     12.    On this news, Amyris's stock fell from $9.73 per share on February 9, 2012, to

15 close at $6.99 per share on February 10, 2012.

16     13.    From approximately February 22, 2011 through February 10, 2012 (the

17 "Relevant Period"), the Individual Defendants knew that:

18         (a)    manufacturing and production problems likely would have a dramatic

19 adverse impact on the Company's ability to successfully produce Biofene; and

20         (b)    as a result of the false and misleading statements disseminated by the

21 Individual Defendants, the price of Amyris stock was artificially high.

22     14.    Despite this knowledge, the Individual Defendants consistently misled investors

23 about Amyris's current and future business and financial condition in order to artificially

24 inflate the Company's stock price. In particular, throughout the Relevant Period, the

25 Individual Defendants made materially false and misleading statements concerning, *inter alia*,

26 the Company's production facilities and joint venture contracts, and the overall current and

27 future business prospects for Biofene and the Company. The Individual Defendants

28

1    improperly claimed that the Company was adequately addressing problems at the facility when
2    it was not, failed to disclose that these ongoing problems likely would cause the Company to
3    be unable to meet the previously announced production levels, and consistently offered
4    optimistic financial projections with no reasonable basis in fact. As a result of the Individual
5    Defendants' misleading statements, Amyris's stock traded at artificially inflated prices during
6    the Relevant Period, reaching a high of $33.37 per share on January 31, 2011.

7       15.    Throughout the Relevant Period, the Individual Defendants were forced to
8    partially disclose the truth about these issues. While these partial disclosures caused
9    temporary declines in the Company's stock price, this price remained artificially inflated
10   because the Individual Defendants hid the full truth from investors.

11      16.    By May 14, 2012, as a result of loss of investor confidence due to the
12   continuing revelations that the Individual Defendants had caused the Company to issue false
13   and misleading statements, the stock's price closed at a low of just $1.59. The stock price
14   remains far below the artificially high prices caused by the Individual Defendants' false and
15   misleading statements, closing at $2.82 on July 22, 2013.

16      17.    Certain Individual Defendants took advantage of the artificially inflated prices
17   to sell their Amyris shares for substantial proceeds. For example, before the value of Amyris
18   stock collapsed, Defendant Melo sold hundreds of thousands of shares of personally-held
19   common stock in highly unusual circumstances for proceeds of approximately $6.42 million.
20   Altogether, Amyris insiders sold over $21 million of personally held common stock on the
21   basis of this nonpublic, materially adverse information.

22      18.    Amyris's Board of Directors (the "Board") has not, and will not commence
23   litigation against the Individual Defendants named in this complaint, let alone vigorously
24   prosecute such claims, because they face a substantial likelihood of liability to Amyris for
25   authorizing or failing to correct the false and misleading statements alleged herein.
26   Accordingly, a pre-suit demand upon Amyris's Board is a useless and futile act. Thus,

27

28
                                           4
     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Plaintiff rightfully brings this action to vindicate Amyris's rights against its wayward

2    fiduciaries and hold them responsible for the damages they have caused to Amyris.

3    **II.**    **JURISDICTION AND VENUE**

4       19.    This Court has jurisdiction over all claims under 28 U.S.C. §1332 because there

5    is complete diversity among the parties and the amount in controversy exceeds the sum of

6    $75,000, exclusive of interest and costs. This action is not a collusive action designed to

7    confer jurisdiction on a court of the United States that it would not otherwise have.

8       20.    This Court has jurisdiction over each Defendant named herein because each

9    Defendant is either a corporation that conducts business in and maintains operations in this

10    District, or is an individual who has sufficient minimum contacts with this District so as to

11    render the exercise of jurisdiction by the courts of this District permissible under traditional

12    notions of fair play and substantial justice.

13       21.    Venue is proper in this Court because Amyris has a substantial presence in

14    California and is headquartered in this District. Moreover, each Defendant has extensive

15    contacts with California as a director and/or officer of Amyris or otherwise, which makes the

16    exercise of personal jurisdiction over them proper.

17    **III.**    **THE PARTIES**

18       22.    Plaintiff is, and at all relevant times has been, a holder of Amyris common

19    stock. Plaintiff is a resident of Arkansas.

20       23.    Nominal Defendant Amyris is incorporated in Delaware and trades on the

21    NASDAQ Stock Market ("NASDAQ") under the symbol "AMRS." The Company's

22    headquarters are located at 5885 Hollis Street, Suite 100, Emeryville, California 94608.

23    Amyris is a renewable products company focused on providing alternatives to petroleum-

24    sourced products. A copy of this complaint was given to Amyris before filing.

25       24.    Defendant Melo has been Chief Executive Officer ("CEO") of the Company

26    since January 2007, and has also served as President since August 2008. Melo has also been a

27    director of the Company since January 2007. From 2011 to 2012, Melo received at least

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | $5,071,147 in compensation, including stock awards, from Amyris. Melo is a citizen of
2 | California.

3 |     25.    Defendant Arthur Levinson ("Levinson") is Chairman of the Board of Amyris,
4 | a position he has held since April 2010. From 2011 to 2012, Levinson received at least
5 | $238,181 in compensation, including stock awards, from Amyris. Levinson is a citizen of
6 | California.

7 |     26.    Defendant Ralph Alexander ("Alexander") served as a director of the Company
8 | from 2007 until July 2013. Alexander was a member of the Company's Audit Committee
9 | from March 2010 until July 2013. From 2011 to 2012, Alexander received at least $715,409
10 | in compensation, including stock awards, from Amyris. Alexander is a citizen of Texas.

11 |     27.    Defendant Philippe Boisseau ("Boisseau") has served as a director of the
12 | Company since November 2010. From 2011 to 2012, Boisseau received at least $80,000 in
13 | compensation, including stock awards, from Amyris. Boisseau is a citizen of France.

14 |     28.    Defendant L. John Doerr ("Doerr") has served as a director of the Company
15 | since May 2006. From 2011 to 2012, Doerr received at least $692,715 in compensation,
16 | including stock awards, from Amyris. Doerr is a citizen of California.

17 |     29.    Defendant Geoffrey Duyk ("Duyk") has served as a director of the Company
18 | since May 2012, and previously served as a director from May 2006 to May 2011. Duyk was
19 | a member of the Company's Audit Committee until May 2011. From 2011 to 2012, Duyk
20 | received at least $552,936 in compensation, including stock awards, from Amyris. Duyk is a
21 | citizen of California.

22 |     30.    Defendant Samir Kaul ("Kaul") served as a director of the Company from May
23 | 2006 to May 2012. Kaul was a member of the Company's Audit Committee from May 2011
24 | until May 2012. From 2011 to 2012, Kaul received at least $643,396 in compensation,
25 | including stock awards, from Amyris. Kaul is a citizen of Maryland.

26 |     31.    Defendant Patrick Pichette ("Pichette") served as a director of the Company
27 | from March 2010 to May 2013. Pichette was a member of the Company's Audit Committee

28 |
6
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  from March 2010 to May 2013. From 2011 to 2012, Pichette received at least \$274,875 in
2  compensation, including stock awards, from Amyris. Pichette is a citizen of California.

3      32.    Defendant Carole Piwnica ("Piwnica") has served as a director of the Company
4  since September 2009.   From 2011 to 2012, Piwnica received at least \$701,715 in
5  compensation, including stock awards, from Amyris.  Piwnica is a citizen of the United
6  Kingdom.

7      33.    Defendant Keith Kinkead Reiling ("Reiling") served as a director of the
8  Company from 2003 to 2006 and from July 2008 until April 2011. Reiling was a co-founder
9  of Amyris and previously held positions with the Company as President (2003 until 2008) and
10  Senior Vice President of Corporate Development (2008 until 2011). Reiling is a citizen of
11  California.

12      34.    Defendant Fernando Reinach ("Reinach") has served as a director of the
13  Company since September 2008. From 2011 to 2012, Reinach received at least \$680,409 in
14  compensation, including stock awards, from Amyris. Reinach is a citizen of Brazil.

15      35.    Defendant Neil Renninger ("Renninger") served as a director of the Company
16  from April 2011 to February 2013. Renninger was a co-founder of Amyris and previously
17  served as a director from 2003 until 2008, and also held positions with the Company as Vice
18  President of Development (2003 until 2007), Senior Vice President of Development (2007
19  until 2008), and Chief Technological Officer (2008 until 2013). In 2012, Renninger received
20  at least \$929,378 in compensation, including stock awards, from Amyris. Renninger is a
21  citizen of California.

22      36.    Defendant Peter Boynton ("Boynton") has been the Company's Chief
23  Commercial Officer since December 2009. In 2011, Boynton received at least \$1,032,702 in
24  compensation, including stock awards, from Amyris. Boynton is a citizen of Florida.

25      37.    Defendant Joel Cherry ("Cherry") is, and has been since July 2011, the
26  Company's President of Research and Development. Cherry was also the Company's Senior
27  Vice President, Research and Operations from November 2008 until May 2012. In 2012,

28

                                    7
                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Cherry received at least $1,087,477 in compensation, including stock awards, from Amyris.
2    Cherry is a citizen of California.

3        38.    Defendant Jeryl Hilleman ("Hilleman") was the Company's Chief Financial
4    Officer from January 2008 to May 2012. In 2011, Hilleman received at least $850,430 in
5    compensation, including stock awards, from Amyris. Hilleman is a citizen of California.

6        39.    Defendant Jefferson Lievense ("Lievense") was the Company's Senior Vice
7    President, Process Development and Manufacturing from December 2007 until April 2012.
8    Lievense is a citizen of California.

9        40.    Defendant Tamara Tompkins ("Tompkins") was the Company's General
10   Counsel from February 2005 until May 2012 and Secretary from November 2005 to May
11   2012. From 2011 to 2012, Tompkins received at least $2,726,235 in compensation, including
12   stock awards, from Amyris. Tompkins is a citizen of California.

13       41.    Defendant Mario Portela ("Portela") was the Company's President of Global
14   Operations from December 2009 to May 2012. From 2011 to 2012, Portela received at least
15   $1,643,571 in compensation, including stock awards, from Amyris. Portela is a citizen of
16   Texas.

17       42.    Defendants Melo, Levinson, Alexander, Boisseau, Doerr, Duyk, Kaul, Pichette,
18   Piwnica, Reiling, Reinach, Renninger, Boynton, Cherry, Hilleman, Lievense, Tompkins, and
19   Portela are referred to herein as the "Individual Defendants."

20       43.    Defendants Melo, Levinson, Alexander, Boisseau, Doerr, Duyk, Kaul, Pichette,
21   Piwnica, Reiling, Reinach, and Renninger are all current or former Board members and are
22   sometimes collectively referred to herein as the "Board" or the "Director Defendants."

23       44.    Defendants Melo, Renninger, Reiling, Kaul, Tompkins, Lievense, Cherry,
24   Portela, Boynton and Hilleman are sometimes collectively referred to herein as the "Insider
25   Selling Defendants."

26
27   //
28
                                            8
     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

IV.    **FACTUAL ALLEGATIONS**

    **A.**    **Background**

    45.    Amyris was founded in 2003 by a group of scientists at the University of California, Berkeley. Amyris's first milestone was in 2005, when the Company's scientists developed technology to produce artemisinic acid, a precursor to artemisinin, an effective anti-malarial drug.

    46.    Following the Company's success with semi-synthetic artemisinin, Amyris applied its industrial synthetic biology technology to provide alternatives to petroleum-sourced products. Amyris uses patented engineered microbes to convert plant-based sugars into renewable chemicals, which are then used in products such as transportation fuels, lubricants, cosmetics, fragrances and flavorings.

    47.    Amyris focused its development on a particular renewable chemical trademarked as Biofene, Amyris's brand of renewable farnesene. Among other uses, Biofene can be used in biodiesel and other transportation fuels.

    48.    In September 2010, the Company launched its initial public offering ("IPO") of 5.3 million shares priced at $16.00 per share. At the time of the IPO, Defendant Melo explained that Amyris was focusing on Brazil and its resources of sugar cane to use for production, since "Brazil is like the Saudi Arabia of biomass."

    49.    In order to compete with oil and other traditional fuel sources, Amyris would need to create and sell biofuel products in large quantities and at competitive prices. Amyris relied on joint venture agreements with chemical producers in order to use their facilities for Biofene production.

    **B.**    **False and Misleading Statements**

    50.    On February 22, 2011, the Individual Defendants caused Amyris to issue a press release titled "Amyris Technology Performs Successfully at Industrial Scale," which announced that the Company had successfully completed multiple runs of Biofene in large

1    capacity fermentors, and that the Company expected to commence commercial production of

2    Biofene in the second quarter of 2011. Specifically, the press release stated that:

3        EMERYVILLE, Calif.--(BUSINESS WIRE)--Amyris, Inc. (NASDAQ:
         AMRS) announced today that it has completed multiple runs of its fermentation
4        process using Amyris engineered yeast to produce Biofene™, Amyris
         renewable farnesene, in 100,000 and 200,000 liter capacity fermentors. These
5        runs were completed through contract manufacturing operations in North
         America and Europe. The results of these fermentation runs, including yields,
6        were consistent with previous runs at smaller scale.

7        "These runs significantly de-risk our operations at industrial scale," said Jeff
         Lievense, senior vice president of process development and manufacturing at
8        Amyris. "These experiences have given us valuable insight into how our yeast
         will perform at commercial scale, and the fact that our yeast performance
9        translated from lab to industrial scale is a strong testament to our technology
         and the capability of our scientists and engineers."
10
         Amyris expects to commence commercial production of Biofene in the second
11       quarter of 2011 and ramp production through manufacturing arrangements with
         entities including Biomin and Tate & Lyle. In addition, Amyris and Grupo São
12       Martinho, a leading sugar and ethanol producer in Brazil, have commenced site
         preparation on their joint venture production facility at Usina São Martinho. All
13       of these facilities will utilize fermentors with capacities ranging between
         100,000 and 600,000 liters.
14
         51.    On February 28, 2011, the Company reported its financial results for the fourth
15
     quarter and year ended December 31, 2010. In a press release issued the same day, Defendant
16
     Melo reported that:
17
18       We met all of our publicly-stated milestones for our first full quarter as a public
         company, and delivered additional product partnerships as well.  We have
19       entered 2011 well-positioned to move into industrial-scale production and sales
         of our first renewable products, beginning with squalane for cosmetics and
20       followed by lubricants.

21       52.    On March 3, 2011, the Individual Defendants caused Amyris to announce that

22   the Company had entered into a contract manufacturing agreement with Antibióticos, S.A., to

23   produce farnesene in Spain. As announced in the press release:
         This is Amyris's fourth farnesene production agreement.  The first was to
24       establish a joint venture with Grupo São Martinho at their flagship mill, Usina
         São Martinho.  In addition, Amyris has contracted for production capacity at
25       the facilities of Biomin GMBH and Tate & Lyle Ingredients Americas, Inc., an
         affiliate of Tate & Lyle PLC.  Finally, Amyris has entered into an agreement
26       with Glycotech, Inc. to provide finishing services to convert the Amyris
27       Biofene into other products, including squalane, lubricants and diesel.

28                                          10
                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     "This agreement with Antibióticos should allow us to reach our target initial production levels and meet customer demand for our near-term product offerings," said John Melo, CEO of Amyris. "We have been very impressed with the world-class technical expertise in aseptic fermentation at Antibióticos, and are looking forward to leverage this as we build up our commercial production capability."

2

3

4

5     53.     On March 21, 2011, the Individual Defendants caused Amyris to announce that

6 the Company had entered into a joint venture agreement for the North American market with

7 U.S. Venture, Inc., for the production, marketing and distribution of lubricants using Amyris's

synthetic renewable base oils derived from Biofene.

8

9     54.     On March 22, 2011, the Individual Defendants caused Amyris to announce that

10 the Company had entered into a manufacturing agreement with a company in Brazil to produce

Amyris products. The press release issued that day stated:

11

12     Amyris, Inc. (NASDAQ:AMRS) announced today that it has entered into a manufacturing agreement with Paraíso Bioenergia S.A., a renewable energy company producing sugar, ethanol and electricity headquartered in São Paulo State, Brazil. Under the agreement, Amyris will construct fermentation and separation capacity to produce Amyris products and Paraíso will supply sugar cane juice and other utilities; Amyris will retain the full economic benefits enabled by the sale of Amyris renewable products over the lower of sugar or ethanol alternatives.

13

14

15

16

17     The new production facility will be designed to process juice from up to one million tons of cane annually. By leveraging Paraíso's infrastructure and feedstock, Amyris expects to be able to begin production at the location in 2012.

18

19

20     "With our success to date in running our technology at industrial scale, we are now able to enter into a broader range of production arrangements to support commercialization of our products," said John Melo, CEO of Amyris. "Our agreement with Paraíso, an established and respected cane processor, gives us another springboard to move quickly to commercial scale production."

21

22

23     "Paraíso is increasingly looking to diversify the uses of sugar cane," said Dario Gaeta, CEO of Paraíso. "Amyris's facility emphasizes Paraíso's leadership in leveraging new technologies."

24

25

26     The Paraíso-based operation represents Amyris's fifth production agreement at locations spanning three continents. Amyris expects to begin contract manufacturing production this year in Brazil at Biomin GMBH, in the U.S. with Tate & Lyle Ingredients Americas, Inc., an affiliate of Tate & Lyle PLC and in

27

28

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Spain with Antibióticos. In 2012, Amyris expects to commence production at Paraíso and SMA Indústria Química S.A., Amyris's joint venture with Grupo São Martinho. Amyris plans to produce Biofene™, Amyris's renewable farnesene, at these facilities and then sell the farnesene directly to industrial customers or chemically finish it into a range of final products. Currently, Amyris is performing finishing under an agreement with Glycotech, Inc.

55. On April 29, 2011, the Individual Defendants caused Amyris to issue a press release titled "Amyris's First Commercial Production Facility Complete and Operational," announcing that the Company had successfully completed an industrial-scale facility in Brazil, to allow the Company to continue sustained commercial production of Biofene. The press release stated that:

Amyris, Inc., (NASDAQ:AMRS), a renewable chemicals and fuels company, today announced the completion of the first industrial-scale facility for the production of Biofene™, Amyris's renewable farnesene. The production facility is located in Piracicaba, São Paulo, Brazil at a facility owned by Biomin do Brasil Nutrição Animal Ltda., a company focusing on animal nutrition. Amyris will operate the production facility and expects to begin Biofene production in May. To produce Biofene, Amyris feeds sugar cane syrup into three dedicated 200,000 liter fermentors containing Amyris proprietary yeast. The yeast digest the syrup feedstock and produce farnesene, which is then separated and purified. Biofene may then be sold directly into industrial applications or put through simple chemical finishing steps to form a broad range of renewable products including squalane, base oil and finished lubricants and diesel.

To achieve production at full industrial scale, Amyris has developed an integrated scale-up process which connects ongoing advances in Amyris research with industrial-scale production. By miniaturizing process conditions found in production-scale fermentors, Amyris has been able to translate yeast performance successfully from discovery to production. Amyris further controls scale-up by testing performance in its pilot plant in Emeryville, Calif., followed by vetting in a second pilot plant and a demonstration facility in Amyris's operations in Campinas, Brazil. Earlier this year, Amyris tested its yeast strains and process in several runs at 100,000 and 200,000 liter scale and generated results that were consistent with previous runs at smaller scale.

"The completion of our first Biofene production facility is a landmark not only for Amyris but also for the renewable products sector," said John Melo, CEO of Amyris. "With this milestone, we are demonstrating that engineered yeast may be used to produce high-value hydrocarbon molecules on a commercial scale. This achievement reinforces our goal of providing No Compromise®

renewable alternatives to petroleum to transform the chemicals industry, extend the world's fuel supply and contribute to the betterment of our environment."

Amyris is scaling its production through contract agreements with manufacturers located in Brazil, Europe and the United States, and has five production agreements in place including contract agreements with Antibioticós S.A., Biomin, Paraíso Bioenergia S.A., Tate & Lyle Ingredients Americas, Inc., an affiliate of Tate & Lyle PLC, and a joint venture with Usina São Martinho S.A., one of the largest sugar and ethanol producers in Brazil. Amyris has also established finishing capabilities with Glycotech, Inc.

56.     On May 5, 2011, the Company reported its financial results for the first quarter ended March 31, 2011, and reported that the Company's balance of cash, cash equivalents and marketable securities was $227.2 million, versus $257.9 million at the end of the prior quarter. In a press release issued the same day, Defendant Melo reported that:

We continue to meet our critical milestones, including delivering our first renewable product to customers and completing our first commercial production facility. These achievements clearly communicate that we have become a commercial operation, and our focus as a company is to ramp up our operations quickly to meet customer demand and deliver a growing portfolio of high-value, renewable products.

57.     Also on the same day, during the Company's first quarter 2011 earnings call with investors and financial analysts, the Individual Defendants continued to assure investors that Amyris could produce Biofene on a commercial scale. Defendant Melo stated:

We expect these five facilities to produce 200 million liters at target production efficiency and we believe that the demand potential represented by our distribution partners and current off-take agreements is over $1 billion at annual sales by 2013. Further, we expect to add to this portfolio of off-take agreements substantially during the remainder of this year with active discussions underway with customers representing an additional $400 million to $600 million in annual revenue potential.

58.     However, the Individual Defendants had no reasonable basis for either this timeline or their repeated optimistic statements about Biofene production, because of known, systematic problems with production operations. Despite this knowledge, the Individual Defendants continued to cause Amyris to assure investors that Biofene production was operating smoothly.

13
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    59.    On July 25, 2011, the Individual Defendants caused the Company to announce

2  that commercial production of Biofene would increase through a second industrial-scale

3  production facility. As stated in the press release issued that day:

4      Amyris, Inc. (NASDAQ:AMRS) announced the commissioning of its second
5      industrial-scale facility for the production of Biofene™, Amyris's renewable
       farnesene. The production facility is located in León, Spain at a facility owned
6      by Antibióticos, S.A. Amyris is currently producing Biofene using Amyris
       equipment at a facility owned by Biomin do Brasil Nutricão Animal Ltda. in
7      Piracicaba, Brazil.

8      Amyris plans to sell Biofene directly for use in industrial applications or to
9      apply simple chemical finishing steps to Biofene to form a broad range of
       renewable products including squalane, base oil and finished lubricants and
10     diesel.

11     "We are pleased to ramp up Biofene volume with our second commercial
12     production facility," said John Melo, CEO of Amyris. "We are seeing strong
       customer demand for squalane and our renewable diesel, and this increase in
13     production also supports our expected near-term commercialization of Amyris
       base oils."
14

15     Amyris is scaling its production through agreements with manufacturers located
       in Brazil, Europe and the United States, and has five production agreements in
16     place including contract manufacturing agreements with Antibióticos, Biomin,
       Paraíso Bioenergia Ltda., Tate & Lyle Ingredients Americas, Inc., an affiliate of
17     Tate & Lyle PLC, and a joint venture with Usina São Martinho, one of the
       largest sugar and ethanol producers in Brazil. Amyris has also established
18     chemical finishing capabilities under a production agreement with Glycotech,
       Inc.
19

20     60.    On August 2, 2011, the Company reported its financial results for the second

21  quarter ended June 30, 2011. In a press release issued the same day, Amyris announced that it

22  had entered into a term sheet with Total Gas & Power USA SAS, an affiliate of Total S.A., to

23  expand the current collaboration and to form a joint venture to commercialize Amyris No

24  Compromise® Renewable Diesel and provide capital for the acquisition and construction of

25  dedicated production facilities. In the press release, Defendant Melo stated:
       We are very excited to be expanding our relationship with Total, and view this
26     as an affirmation of our technologies and products by a partner who has come
       to know us well. We expect that our partnership with Total has the potential to
27     reduce our net cash operating expenditures by as much as $100 million through

28                                      14
       VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2013. We are growing other current relationships as well, including the recent formation of our lubricants joint venture with Cosan and the addition of a third product with Firmenich, and have added agreements with four new customers — Wilmar, Kuraray and the São Paulo and Rio bus fleets. Finally, we are supporting this demand activity with our progress in production; we are now producing Biofene™ at Biomin and at Antibióticos. Overall, we feel this has been a transformative quarter for Amyris.

61. Also on the same day, during the Company's second quarter 2011 earnings call with investors and financial analysts, Defendant Melo stated that the Company's production plants had ramped up quickly and were delivering 99% of target production volume. Defendant Melo also repeated the claim that the Company expected the five production facilities together to produce over 200 million liters a year.

C.  The Truth is Revealed

62. On November 1, 2011, the truth began to be revealed when the Company reported its financial results for the third quarter ended September 30, 2011, stating that the Company's balance at the end of the third quarter of cash, cash equivalents and marketable securities was down to $123.8 million.

63. For the first time, during the Company's third quarter 2011 earnings call with investors and financial analysts, Defendant Melo indicated that there were problems with production, and revealed that "we decided to slow down our production ramp this year to produce a total of 1 million to 2 million liters of farnesene and achieve a year-end run rate in the range of 700,000 liters of production a month."

64. On this news, Amyris's stock fell 20% in one day, from $19.36 per share on November 1, 2011, to close at $15.47 per share on November 2, 2011. By November 4, 2011, the stock had fallen to $14.05 per share.

65. On February 9, 2012, the Individual Defendants finally caused Amyris to admit that production would be much lower than investors had been told, that the Company would not have positive cash flow in 2012, and that the Company would discontinue issuing production targets, and instead give regular updates on performance. Defendant Melo stated

15
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    that Amyris would not be completing the expansion of one of its 100 million liter plants, and

2    stated:

> Given the lower plant volume, we are no longer adhering to our previously announced plan to produce 40 million liters to 50 million liters of Biofene in 2012. Second, we are no longer forecasting positive cash flows from operations in 2012. To cover this gap, we are raising additional equity financing.

66.    On this news, Amyris's stock fell from $9.73 per share on February 9, 2012, to close at $6.99 per share on February 10, 2012.

67.    On February 27, 2012, the Individual Defendants caused the Company to announce that it had completed a $58.7 million private placement of common stock, priced at $5.78 per share, based on the closing price for Amyris common stock of $5.77 per share on February 22, 2012.

68.    On February 27, 2012, the Company reported its financial results for the fourth quarter and year ended December 31, 2011, and reported that the Company's balance of cash, cash equivalents and marketable securities was down to $103.6 million. In a press release issued the same day, Defendant Melo stated that:

> 2011 was a year of accomplishment and learning. We opened three facilities on three continents to produce initial volumes of Biofene®, our renewable farnesene, and have now produced over 1.3 million liters of Biofene, which we are selling initially as squalane and diesel. We have proven that our technology produces renewable hydrocarbons at scale and continue to meet our current customer demand for quality and performance. With the additional financing we have secured, we have a strong position to ramp our production to meet the needs of an expanding group of customers.

69.    Despite the false and misleading statements made to investors during the Relevant Period, the Individual Defendants knew that:

(c)    manufacturing and production problems likely would have a dramatic adverse impact on the Company's ability to successfully produce Biofene; and

(d)    as a result of the false and misleading statements disseminated by the Individual Defendants, the price of Amyris stock was artificially high.

70.    Despite their knowledge, the Individual Defendants consistently misled investors about Amyris's current and future business and financial condition in order to

16

1  artificially inflate the Company's stock price. In particular, throughout the Relevant Period,
2  the Individual Defendants made materially false and misleading statements concerning, *inter*
3  *alia*, the Company's production facilities and joint venture contracts, and the overall current
4  and future business prospects for Biofene and the Company. The Individual Defendants
5  improperly claimed that the Company was adequately addressing problems at the facility when
6  it was not, failed to disclose that these ongoing problems likely would cause the Company to
7  be unable to meet the previously announced production levels, and consistently offered
8  optimistic financial projections with no reasonable basis in fact. As a result of the Individual
9  Defendants' misleading statements, Amyris's stock traded at artificially inflated prices during
10 the Relevant Period, reaching a high of $33.37 per share on January 31, 2011.

11     71.    At different times throughout the Relevant Period, the Individual Defendants
12 were forced to partially disclose the truth about these issues. While these partial disclosures
13 caused temporary declines in the Company's stock price, this price remained artificially
14 inflated because the Individual Defendants hid the full truth from investors.

15     72.    By May 14, 2012, as a result of loss of investor confidence due to the
16 continuing revelations that the Individual Defendants had caused the Company to issue false
17 and misleading statements, Amyris's stock price closed at a low of just $1.59.

18     73.    However, the Individual Defendants continued to cause Amyris to mislead
19 investors and to continue to make false and misleading statements about the Company's
20 current and future business and financial condition. For example, during the earnings
21 conference call with investors on July 31, 2012 reporting financial results for the second
22 quarter of 2012, Defendant Melo stated:

23          What you should expect from us through the end of the year is additional
            funding, successful commissioning of Paraíso, a steady increase in renewable
24          product sales from inventory on hand and a continued reduction in our cash
            burn.
25
        74.    Yet throughout 2012, Amyris continued to report disappointing results. On
26 February 19, 2013, the Company reported its financial results for the fourth quarter and year
27 ended December 31, 2012, and reported that the Company's balance of cash, cash equivalents
28                                       17
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    and marketable securities was down to \$30.7 million. Although renewable product sales

2    were \$10.8 million for the year compared to \$0.8 million for the prior year, aggregate revenues

3    for the year ended December 31, 2012 were \$73.7 million versus \$147.0 million in the prior

4    year, and aggregate revenues for the quarter ended December 31, 2012 were \$5.9

5    million versus \$41.5 million in the fourth quarter of 2011, due to the Company's transition out

6    of the ethanol and ethanol-blended gasoline business, which was completed in the third quarter

7    of 2012.

8          75.     The Company's stock price remains far below the artificially high prices caused

9    by the Individual Defendants' false and misleading statements, closing at \$2.76 on August 1,

10    2013.

11          **D.**     **Insider Selling**

12          76.     Certain Individual Defendants took advantage of the artificially inflated prices

13    to sell their Amyris shares for substantial proceeds. These Insider Selling Defendants sold

14    over \$21 million of personally held common stock during the Relevant Period, as detailed in

15    the following table:

| Name | Date | Shares | Price | Total | |
|---|---|---|---|---|---|
| **Boynton, Peter** | 4/5/2011 | 21,400 | \$ 27.11 | \$ | 580,154.00 |
| | 4/5/2011 | 100 | \$ 27.93 | \$ | 2,793.00 |
| | 4/5/2011 | 21,500 | \$ 9.32 | \$ | 200,380.00 |
| | 5/9/2011 | 7,200 | \$ 24.87 | \$ | 179,064.00 |
| | 5/9/2011 | 7,200 | \$ 9.32 | \$ | 67,104.00 |
| | 5/26/2011 | 14,300 | \$ 29.69 | \$ | 424,567.00 |
| | 5/26/2011 | 14,300 | \$ 9.32 | \$ | 133,276.00 |
| | | | | **\$** | **1,587,338.00** |
| | | | | | |
| **Cherry, Joel** | 3/28/2011 | 5,000 | \$ 27.13 | \$ | 135,650.00 |
| | 3/28/2011 | 5,000 | \$ 4.31 | \$ | 21,550.00 |
| | 3/29/2011 | 3,000 | \$ 28.08 | \$ | 84,240.00 |
| | 3/29/2011 | 3,000 | \$ 4.31 | \$ | 12,930.00 |
| | 5/9/2011 | 5,000 | \$ 25.01 | \$ | 125,050.00 |
| | 5/9/2011 | 5,000 | \$ 4.31 | \$ | 21,550.00 |
| | 5/26/2011 | 5,000 | \$ 28.63 | \$ | 143,150.00 |

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| | 5/26/2011 | 1,621 | $ 29.89 | $ | 48,451.69 |
| | 5/26/2011 | 6,621 | $ 4.31 | $ | 28,536.51 |
| | 5/27/2011 | 914 | $ 29.89 | $ | 27,319.46 |
| | 5/27/2011 | 914 | $ 4.31 | $ | 3,939.34 |
| | 6/21/2011 | 3,068 | $ 29.90 | $ | 91,733.20 |
| | 6/21/2011 | 3,068 | $ 4.31 | $ | 13,223.08 |
| | 6/24/2011 | 4,397 | $ 29.89 | $ | 131,426.33 |
| | 6/24/2011 | 4,397 | $ 4.31 | $ | 18,951.07 |
| | 6/27/2011 | 4,800 | $ 29.75 | $ | 142,800.00 |
| | 6/27/2011 | 200 | $ 30.37 | $ | 6,074.00 |
| | 6/27/2011 | 5,000 | $ 4.31 | $ | 21,550.00 |
| | 8/8/2011 | 4,500 | $20.05 | $ | 90,225.00 |
| | 8/8/2011 | 4,500 | $4.31 | $ | 19,395.00 |
| | 8/26/2011 | 4,000 | $18.35 | $ | 73,400.00 |
| | 8/26/2011 | 4,000 | $4.31 | $ | 17,240.00 |
| | 8/29/2011 | 500 | $19.89 | $ | 9,945.00 |
| | 8/29/2011 | 500 | $ 4.31 | $ | 2,155.00 |
| | 9/26/2011 | 4,500 | $ 19.47 | $ | 87,615.00 |
| | 9/26/2011 | 4,500 | $ 4.31 | $ | 19,395.00 |
| | | | | $ | 1,833,557.68 |
| | | | | | |
| Hilleman, Jeryl | 4/15/2011 | 19,885 | $ 26.28 | $ | 522,577.80 |
| | 4/15/2011 | 16,115 | $ 26.28 | $ | 423,502.20 |
| | 4/15/2011 | 19,885 | $ 3.93 | $ | 78,148.05 |
| | 5/18/2011 | 2,576 | $ - | $ | - |
| | 5/18/2011 | 3,000 | $ 28.00 | $ | 84,000.00 |
| | 5/18/2011 | 2,576 | $ 3.93 | $ | 10,123.68 |
| | 5/19/2011 | 6,401 | $ 3.93 | $ | 25,155.93 |
| | 5/19/2011 | 6,401 | $ - | $ | - |
| | 5/19/2011 | 6,401 | $ 28.00 | $ | 179,228.00 |
| | 5/20/2011 | 3,599 | $ - | $ | - |
| | 5/20/2011 | 3,599 | $ 28.00 | $ | 100,772.00 |
| | 5/20/2011 | 3,599 | $ 3.93 | $ | 14,144.07 |
| | | | | $ | 1,437,651.73 |
| | | | | | |
| Kaul, Samir | 3/9/2011 | 1,712 | $ - | $ | - |
| | 5/12/2011 | 6,670 | $ 25.83 | $ | 172,286.10 |
| | 6/2/2011 | 490,776 | $ - | $ | - |
| | 6/8/2011 | 49,077 | $ - | $ | - |
| | 6/13/2011 | 10,010 | $ 28.53 | $ | 285,585.30 |
| | 7/12/2011 | 6,665 | $27.33 | $ | 182,154.45 |

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | 8/12/2011 | 6,665 | $ 19.93 | $ | 132,833.45 |
|---|---|---|---|---|---|---|
| | | 9/13/2011 | 16,665 | $ 18.00 | $ | 299,970.00 |
| | | 10/12/2011 | 16,665 | $ 16.36 | $ | 272,639.40 |
| | | | | | $ | **1,345,468.70** |
| | | | | | | |
| **Lievense, Jefferson** | | 4/5/2011 | 12,000 | $ 27.11 | $ | 325,320.00 |
| | | 4/6/2011 | 14,000 | $ 28.00 | $ | 392,000.00 |
| | | 4/5/2011 | 12,000 | $ 3.93 | $ | 47,160.00 |
| | | 4/6/2011 | 14,000 | $ 3.93 | $ | 55,020.00 |
| | | 5/9/2011 | 23,900 | $ 24.88 | $ | 594,632.00 |
| | | 5/9/2011 | 100 | $ 25.40 | $ | 2,540.00 |
| | | 5/9/2011 | 24,000 | $ 3.93 | $ | 94,320.00 |
| | | 5/19/2011 | 12,000 | $ 27.72 | $ | 332,640.00 |
| | | 5/19/2011 | 12,000 | $ 3.93 | $ | 47,160.00 |
| | | 6/6/2011 | 8,000 | $ 29.30 | $ | 234,400.00 |
| | | 6/6/2011 | 8,000 | $ 3.93 | $ | 31,440.00 |
| | | | | | $ | **2,156,632.00** |
| | | | | | | |
| **Melo, John** | | 3/28/2011 | 56,000 | $ 27.09 | $ | 1,517,040.00 |
| | | 3/29/2011 | 53,100 | $ 27.98 | $ | 1,485,738.00 |
| | | 3/28/2011 | 56,000 | $ 0.28 | $ | 15,680.00 |
| | | 3/29/2011 | 53,100 | $ 0.28 | $ | 14,868.00 |
| | | 6/30/2011 | 11,900 | $ 28.19 | $ | 335,461.00 |
| | | 6/30/2011 | 11,900 | $ 0.28 | $ | 3,332.00 |
| | | 7/1/2011 | 19,970 | $ 28.05 | $ | 560,158.50 |
| | | 7/1/2011 | 19,970 | $ 0.28 | $ | 5,591.60 |
| | | 7/5/2011 | 8,000 | $ 27.88 | $ | 223,040.00 |
| | | 7/5/2011 | 8,000 | $ 0.28 | $ | 2,240.00 |
| | | 7/6/2011 | 4,500 | $ 28.21 | $ | 126,945.00 |
| | | 7/6/2011 | 4,500 | $ 0.28 | $ | 1,260.00 |
| | | 7/7/2011 | 7,000 | $27.97 | $ | 195,790.00 |
| | | 7/7/2011 | 7,000 | $0.28 | $ | 1,960.00 |
| | | 7/8/2011 | 6,000 | $28.28 | $ | 169,680.00 |
| | | 7/8/2011 | 6,000 | $ 0.28 | $ | 1,680.00 |
| | | 8/8/2011 | 18,400 | $ 20.04 | $ | 368,736.00 |
| | | 8/8/2011 | 100 | $ 20.55 | $ | 2,055.00 |
| | | 8/8/2011 | 18,500 | $ 0.28 | $ | 5,180.00 |
| | | 8/9/2011 | 19,809 | $ 19.66 | $ | 389,444.94 |
| | | 8/9/2011 | 3,991 | $ 20.43 | $ | 81,536.13 |
| | | 8/9/2011 | 23,800 | $ 0.28 | $ | 6,664.00 |

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | 8/10/2011 | 27,400 | $ 20.01 | $ | 548,274.00 |
|---|---|---|---|---|---|
| | 8/10/2011 | 100 | $ 20.67 | $ | 2,067.00 |
| | 8/10/2011 | 27,500 | $ 0.28 | $ | 7,700.00 |
| | 10/10/2011 | 20,000 | $ 17.21 | $ | 344,200.00 |
| | 10/10/2011 | 20,000 | $ 0.28 | $ | 5,600.00 |
| | | | | $ | 6,421,921.17 |
| | | | | | |
| Portela, Mario | 4/15/2011 | 1,389 | $ 26.84 | $ | 37,280.76 |
| | 6/24/2011 | 8,200 | $ 30.00 | $ | 246,000.00 |
| | 6/24/2011 | 8,200 | $ 9.32 | $ | 76,424.00 |
| | 6/27/2011 | 12,394 | $ 30.12 | $ | 373,307.28 |
| | 6/27/2011 | 12,394 | $ 9.32 | $ | 115,512.08 |
| | | | | $ | 848,524.12 |
| | | | | | |
| Reiling, Keith | 4/6/2011 | 35,000 | $ 27.86 | $ | 975,100.00 |
| | | | | $ | 975,100.00 |
| | | | | | |
| Renninger, Neil | 4/7/2011 | 25,000 | $ 27.29 | $ | 682,250.00 |
| | 5/9/2011 | 24,900 | $ 24.77 | $ | 616,773.00 |
| | 5/9/2011 | 100 | $ 25.38 | $ | 2,538.00 |
| | 6/7/2011 | 7,000 | $ 29.13 | $ | 203,910.00 |
| | 6/8/2011 | 18,000 | $ 28.89 | $ | 520,020.00 |
| | 6/21/2011 | 200 | $ 29.98 | $ | 5,996.00 |
| | 7/7/2011 | 7,000 | $27.97 | $ | 195,790.00 |
| | 7/8/2011 | 5,512 | $28.23 | $ | 155,603.76 |
| | 7/8/2011 | 100 | $28.71 | $ | 2,871.00 |
| | 7/11/2011 | 5,300 | $27.97 | $ | 148,241.00 |
| | 7/12/2011 | 7,088 | $27.22 | $ | 192,935.36 |
| | 8/8/2011 | 18,500 | $20.05 | $ | 370,925.00 |
| | 8/9/2011 | 6,400 | $19.78 | $ | 126,592.00 |
| | 8/9/2011 | 100 | $20.37 | $ | 2,037.00 |
| | 9/7/2011 | 20,000 | $19.30 | $ | 386,000.00 |
| | 9/16/2011 | 5,000 | $19.98 | $ | 99,900.00 |
| | 10/7/2011 | 19,900 | $17.47 | $ | 347,653.00 |
| | 10/7/2011 | 100 | $18.20 | $ | 1,820.00 |
| | | | | $ | 4,061,855.12 |
| | | | | | |
| Tompkins, Tamara | 3/28/2011 | 5,000 | $ 27.15 | $ | 135,750.00 |
| | 3/29/2011 | 10,000 | $ 28.00 | $ | 280,000.00 |
| | 5/9/2011 | 17,175 | $ 24.88 | $ | 427,314.00 |

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | 6/9/2011 | 9,500 | $ 28.55 | $ | 271,225.00 |
|---|---|---|---|---|---|
| | 6/10/2011 | 7,496 | $ 28.80 | $ | 215,884.80 |
| | 6/10/2011 | 179 | $ 29.13 | $ | 5,214.27 |
| | 7/11/2011 | 5,300 | $27.98 | $ | 148,294.00 |
| | 7/12/2011 | 7,350 | $27.20 | $ | 199,920.00 |
| | | | | $ | 1,683,602.07 |
| | | | | | |
| **Total** | | | | | **$ 21,915,587.59** |

## V.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

77.    By reason of their positions as officers, directors, and/or fiduciaries of Amyris and because of their ability to control the business and corporate affairs of Amyris, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amyris in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Amyris and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

78.    Each director and officer of the Company owes to Amyris and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### B.   Control, Access, And Authority

79.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amyris, were able to and did, directly and/or indirectly, exercise

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  control over the wrongful acts complained of herein, as well as the contents of the various
2  public statements issued by Amyris.

3      80.    Because of their advisory, executive, managerial, and directorial positions with
4  Amyris, each of the Individual Defendants had access to adverse, non-public information
5  about the financial condition, operations, and improper representations of Amyris.

6      81.    At all times relevant hereto, each of the Individual Defendants was the agent of
7  each of the other Individual Defendants and of Amyris, and was at all times acting within the
8  course and scope of such agency.

9      **C.    Reasonable And Prudent Supervision**

10     82.    To discharge their duties, the officers and directors of Amyris were required to
11  exercise reasonable and prudent supervision over the management, policies, practices and
12  controls of the financial affairs of the Company. By virtue of such duties, the officers and
13  directors of Amyris were required to, among other things:

14     (a)    ensure that the Company complied with its legal obligations and requirements,
15  including acting only within the scope of its legal authority and disseminating truthful and
16  accurate statements to the investing public;

17     (b)    conduct the affairs of the Company in an efficient, business-like manner so as
18  to make it possible to provide the highest quality performance of its business, to avoid wasting
19  the Company's assets, and to maximize the value of the Company's stock;

20     (c)    properly and accurately guide investors and analysts as to the true financial
21  condition of the Company at any given time, including making accurate statements about the
22  Company's financial results;

23     (d)    remain informed as to how Amyris conducted its operations, and, upon receipt
24  of notice or information of imprudent or unsound conditions or practices, make reasonable
25  inquiry in connection therewith, and take steps to correct such conditions or practices and
26  make such disclosures as necessary to comply with securities laws; and

27
28
23
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(e)     ensure that Amyris was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**VI.     BREACHES OF DUTIES**

83.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Amyris and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Amyris, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amyris, the absence of good faith on their part, and a reckless disregard for their duties to Amyris and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Amyris.

84.    The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that the Company's current and future business prospects would not be adversely impacted by the manufacturing and production problems affecting the Company's ability to successfully produce Biofene. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws. As a result, Amyris has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

**VII.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

85.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

24
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    86.    During all times relevant hereto, the Individual Defendants collectively and

2  individually initiated a course of conduct that was designed to mislead shareholders into

3  believing that the Company's current and future business conditions would not be adversely

4  impacted by the manufacturing and production problems affecting the Company's ability to

5  successfully produce Biofene. In furtherance of this plan, conspiracy, and course of conduct,

6  the Individual Defendants collectively and individually took the actions set forth herein.

7    87.    The purpose and effect of the Individual Defendants' conspiracy, common

8  enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

9  Individual Defendants' violations of law, including breaches of fiduciary duty and unjust

10  enrichment; and (b) disguise and misrepresent the Company's future business prospects.

11    88.    The Individual Defendants accomplished their conspiracy, common enterprise,

12  and/or common course of conduct by causing the Company to purposefully, recklessly, or

13  negligently release improper statements. Because the actions described herein occurred under

14  the authority of the Board, each of the Individual Defendants was a direct, necessary, and

15  substantial participant in the conspiracy, common enterprise, and/or common course of

16  conduct complained of herein.

17    89.    Each of the Individual Defendants aided and abetted and rendered substantial

18  assistance in the wrongs complained of herein. In taking such actions to substantially assist

19  the commissions of the wrongdoing complained of herein, each Individual Defendant acted

20  with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

21  wrongdoing, and was aware of his or her overall contribution to and furtherance of the

22  wrongdoing.

23  **VIII.  DAMAGES TO AMYRIS**

24    90.    As a result of the Individual Defendants' wrongful conduct, Amyris

25  disseminated false and misleading statements. The improper statements have devastated

26  Amyris's credibility. Additionally, Amyris is now the subject of a securities fraud class action

27

28    25
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   lawsuit. The Company will face substantial costs in connection with this lawsuit, including
2   expenses defending the suit and damages from a possible judgment or settlement.

3       91.     As a direct and proximate result of the Individual Defendants' actions as
4   alleged above, Amyris's market capitalization has been substantially damaged.

5       92.     Further, as a direct and proximate result of the Individual Defendants' conduct,
6   Amyris has expended and will continue to expend significant sums of money. Such
7   expenditures include, but are not limited to:

8       a.      costs incurred in investigating and defending Amyris and certain officers in the
9   pending securities class action lawsuit, plus potentially hundreds of millions of dollars in
10  settlement or to satisfy an adverse judgment;

11      b.      costs incurred from compensation and benefits paid to the Individual
12  Defendants, which compensation was based at least in part on Amyris's artificially-inflated
13  stock price and inflated revenues; and

14      c.      costs incurred from the loss of the Company's customers' confidence in Amyris
15  services.

16      93.     Moreover, these actions have irreparably damaged Amyris's corporate image
17  and goodwill. For at least the foreseeable future, Amyris will suffer from what is known as the
18  "liar's discount," a term applied to the stocks of companies who have been implicated in
19  illegal behavior and have misled the investing public, such that Amyris's ability to raise equity
20  capital or debt on favorable terms in the future is now impaired.

21  **IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

22      94.     Plaintiff brings this action derivatively in the right and for the benefit of Amyris
23  to redress injuries suffered, and to be suffered, by Amyris as a direct result of the Individual
24  Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and
25  abetting thereof, by the Individual Defendants. Amyris is named as a nominal defendant
26  solely in a derivative capacity.

27
28

26
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   95.    Plaintiff will adequately and fairly represent the interests of Amyris in
2   enforcing and prosecuting its rights.

3   96.    Plaintiff was a shareholder of Amyris common stock at the time of the
4   wrongdoing of which Plaintiff complains and has been continuously since.

5   97.    Plaintiff did not make a pre-suit demand on the Board to pursue this action,
6   because such a demand would have been a futile and wasteful act.

7   98.    In compliance with CAL. CORP. CODE § 800(b)(2), Plaintiff has caused a true
8   and correct copy of this complaint to be delivered to Amyris before filing it with this Court.

9   99.    The Board of Amyris currently consists of the following Defendants: Levinson,
10  Boisseau, Doerr, Duyk, Melo, Piwnica, Reinach, and three non-defendants.

11  **A.     Demand Is Futile As To Defendant Melo**

12  100.   Defendant Melo faces a substantial likelihood of liability for his individual
13  misconduct.  Melo is a named defendant in a federal securities class action pending in this
14  Court alleging that he and the Company violated §10(b) of the Securities Exchange  Act of
15  1934 and Rule 10b-5 when he disseminated or approved false statements.

16  101.   If Defendant Melo pursued these derivative claims, then that would expose his
17  own misconduct in the class action for violations of the federal securities laws. This, in turn,
18  would impair the defense of the class action and greatly increase the probability of Defendant
19  Melo's personal liability in the class action.  As such, Defendant Melo is fatally conflicted,
20  and therefore, unable to render a disinterested decision as to whether the Company should
21  pursue these derivative claims. Thus, demand is futile as to Defendant Melo.

22  102.   Further, Defendant Melo sold shares of common stock for proceeds of over
23  $6.4 million in 2011, taking advantage of the artificial inflation of the Company's stock price.

24  103.   Defendant Melo cannot render an independent decision because he is and was a
25  high-ranking officer of Amyris during the Relevant Period when the wrongdoing occurred.
26  Defendant Melo has served as the Company's CEO throughout the Relevant Period.  Thus,

27

28
27
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Defendant Melo is a current Company insider and therefore cannot independently consider a
2    demand.

3        104.    Additionally, Defendant Melo is interested because he issued many of the false
4    and misleading statements. Defendant Melo therefore faces a substantial likelihood of liability
5    for breaching his fiduciary duties to Amyris shareholders. Consequently, Defendant Melo
6    cannot disinterestedly consider a demand.

7    **B.    Demand Is Futile As To Defendant Boisseau**

8        105.    According to the Company's 2012 Proxy Statement, Defendant Boisseau is not
9    an independent director under NASDAQ listing standards. This decision as to Boisseau's lack
10   of independence was made by the Board itself.

11       106.    Defendant Boisseau cannot render an independent decision because he is an
12   officer of Total S.A., an affiliate of Total G&P, with which Amyris has a technology license,
13   development, research and collaboration agreement that involved annual payments exceeding
14   5% of the Company's yearly gross revenues.

15       107.    Defendant Boisseau was designated to serve on the Board by Total G&P under
16   a letter agreement between Amyris and Total G&P. As of March 15, 2013, Total G&P
17   beneficially owned 13,617,212 shares of Amyris common stock, representing approximately
18   18.4% of the Company's outstanding common stock.  In connection with the equity
19   investment by Total G&P, the Board agreed to appoint a person designated by Total G&P to
20   serve as a member of the Board, and that person is Defendant Boisseau.

21       108.    Demand is futile as to Defendant Boisseau for the additional reason that he
22   faces a substantial likelihood of liability for breach of fiduciary duties for authorizing and/or
23   failing to correct materially misleading statements made by certain of the Individual
24   Defendants on behalf of Amyris. As a director of the Company, Defendant Boisseau has a
25   fiduciary duty to ensure that public material statements about and on behalf of Amyris are true,
26   and he has a duty to correct any such statement that is not true or is misleading. In this case,
27   Defendant Boisseau knew that numerous statements made by Melo and others – statements

28

                                                28

1   made for the express purpose of inducing investment in the Company's stock – were

2   materially misleading. His failure to take corrective action was a breach of fiduciary duty.

3          109.    However, if Defendant Boisseau claims not to have known about these

4   materially misleading statements, then this failure is also a breach of fiduciary duty. Biofene

5   is a core product of Amyris. If Defendant Boisseau did not know about these numerous

6   misleading statements about Biofene then he is liable for utterly abdicating his oversight

7   duties. Such pleas for "ostrich-like immunity" do not absolve Defendant Boisseau or any of

8   the other Director Defendants of liability.

9          **C.     Demand Is Futile As To Defendant Doerr**

10         110.    Defendant Doerr cannot render an independent decision because he is a

11  manager of the general partners of entities affiliated with KPCB Holdings, Inc. As of March

12  15, 2013, KPCB Holdings, Inc. as nominee for entities affiliated with Kleiner Perkins Caufield

13  & Byers, held 4,183,224 shares of Amyris common stock, which represented approximately

14  5.7% of the Company's outstanding common stock. In addition, as of March 15, 2013,

15  Defendant Doerr beneficially owned 6,996,090 shares of Amyris common stock (including

16  3,937,247 shares held by KPCB Holdings, Inc. as nominee, and 3,058,843 other shares

17  beneficially owned by Defendant Doerr, including shares issued directly to him and held by a

18  trust and an investment entity under Defendant Doerr's control), which represented

19  approximately 9.5% of Amyris's outstanding common stock.

20         111.    Demand is futile as to Defendant Doerr for the additional reason that he faces a

21  substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing to

22  correct materially misleading statements made by certain of the Individual Defendants on

23  behalf of Amyris. As a director of the Company, Defendant Doerr has a fiduciary duty to

24  ensure that public material statements about and on behalf of Amyris are true, and he has a

25  duty to correct any such statement that is not true or is misleading. In this case, Defendant

26  Doerr knew that numerous statements made by Melo and others – statements made for the

27

28                                                    29
                    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   express purpose of inducing investment in the Company's stock – were materially misleading.
2   His failure to take corrective action was a breach of fiduciary duty.

3          112.   However, if Defendant Doerr claims not to have known about these materially
4   misleading statements, then this failure is also a breach of fiduciary duty. Biofene is a core
5   product of Amyris. If Defendant Doerr did not know about these numerous misleading
6   statements about Biofene then he is liable for utterly abdicating his oversight duties. Such
7   pleas for "ostrich-like immunity" do not absolve Defendant Doerr or any of the other Director
8   Defendants of liability.

9          **D. Demand Is Futile As To Defendant Duyk**

10         113.   Defendant Duyk cannot render an independent decision because he is a partner
11  of TPG Biotech, an affiliate of TPG Biotechnology Partners II, L.P. As of March 15, 2013,
12  TPG Biotechnology Partners II, L.P. beneficially owned 3,933,590 shares of Amyris common
13  stock, which represented approximately 5.3% of its outstanding common stock.

14         114.   Demand is futile as to Defendant Duyk for the additional reason that he faces a
15  substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing to
16  correct materially misleading statements made by certain of the Individual Defendants on
17  behalf of Amyris. As a director of the Company, Defendant Duyk has a fiduciary duty to
18  ensure that public material statements about and on behalf of Amyris are true, and he has a
19  duty to correct any such statement that is not true or is misleading. In this case, Defendant
20  Duyk knew that numerous statements made by Melo and others – statements made for the
21  express purpose of inducing investment in the Company's stock – were materially misleading.
22  His failure to take corrective action was a breach of fiduciary duty.

23         115.   However, if Defendant Duyk claims not to have known about these materially
24  misleading statements, then this failure is also a breach of fiduciary duty. Biofene is a core
25  product of Amyris. If Defendant Duyk did not know about these numerous misleading
26  statements about Biofene then he is liable for utterly abdicating his oversight duties. Such
27
28                                              30

1  pleas for "ostrich-like immunity" do not absolve Defendant Duyk or any of the other Director
2  Defendants of liability.

3      **E. Demand Is Futile As To Defendant Piwnica**

4      116.    Defendant Piwnica cannot render an independent decision because she is the
5  founder of Naxos Capital Partners, which owns Naxyris SA, an investment vehicle which
6  purchased 1,730,103 shares of Amyris common stock in the February 2012 stock offering.
7  Naxos Capital Partners' website notes that Amyris is one of Naxos' "portfolio companies."

8      117.    Under a letter agreement in connection with the investment, Naxyris SA
9  designated Defendant Piwnica, who was already on the Board, to serve as a representative for
10 Naxyris SA.

11     118.    Demand is futile as to Defendant Piwnica for the additional reason that he faces
12 a substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing
13 to correct materially misleading statements made by certain of the Individual Defendants on
14 behalf of Amyris. As a director of the Company, Defendant Piwnica has a fiduciary duty to
15 ensure that public material statements about and on behalf of Amyris are true, and he has a
16 duty to correct any such statement that is not true or is misleading. In this case, Defendant
17 Piwnica knew that numerous statements made by Melo and others – statements made for the
18 express purpose of inducing investment in the Company's stock – were materially misleading.
19 His failure to take corrective action was a breach of fiduciary duty.

20     119.    However, if Defendant Piwnica claims not to have known about these
21 materially misleading statements, then this failure is also a breach of fiduciary duty. Biofene
22 is a core product of Amyris. If Defendant Piwnica did not know about these numerous
23 misleading statements about Biofene then he is liable for utterly abdicating his oversight
24 duties. Such pleas for "ostrich-like immunity" do not absolve Defendant Piwnica or any of the
25 other Director Defendants of liability.

26

27

28
                                      31

1

**F.     Demand Is Futile As To Defendant Reinach**

2          120.    Defendant Reinach cannot render an independent decision because he was an
3     affiliate of the parent company of Lit Tele LLC during 2010 and continues to have a
4     consulting relationship with such company. As of March 15, 2013, Lit Tele was the record
5     owner of 1,463,793 shares of Amyris common stock, representing approximately 2.0% of the
6     Company's outstanding common stock. Additionally, Defendant Reinach is the sole director
7     of Sualk Capital Ltd, which purchased 170,397 shares of Amyris common stock in private
8     placement offerings during 2012.

9          121.    Demand is futile as to Defendant Reinach for the additional reason that he faces
10    a substantial likelihood of liability for breach of fiduciary duties for authorizing and/or failing
11    to correct materially misleading statements made by certain of the Individual Defendants on
12    behalf of Amyris. As a director of the Company, Defendant Reinach has a fiduciary duty to
13    ensure that public material statements about and on behalf of Amyris are true, and he has a
14    duty to correct any such statement that is not true or is misleading. In this case, Defendant
15    Reinach knew that numerous statements made by Melo and others – statements made for the
16    express purpose of inducing investment in the Company's stock – were materially misleading.
17    His failure to take corrective action was a breach of fiduciary duty.

18         122.    However, if Defendant Reinach claims not to have known about these
19    materially misleading statements, then this failure is also a breach of fiduciary duty. Biofene
20    is a core product of Amyris. If Defendant Reinach did not know about these numerous
21    misleading statements about Biofene then he is liable for utterly abdicating his oversight
22    duties. Such pleas for "ostrich-like immunity" do not absolve Defendant Reinach or any of the
23    other Director Defendants of liability.

24    **G.     Demand Is Futile As To Defendant Levinson**

25         123.    Defendant Levinson faces a substantial likelihood of liability for his breaches of
26    fiduciary duty. He had a fiduciary duty to ensure that the Company's public filings with the
27    SEC, press releases, and other public statements on behalf of the Company were true. Instead,

28

32
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  he knowingly or recklessly reviewed and authorized the publication of materially false and
2  misleading statements throughout the Relevant Period that caused the Company's stock to
3  trade at artificially inflated prices. This authorization of such statements and/or failure to
4  correct them constitutes a breach of fiduciary duty, for which Levinson faces a substantial
5  likelihood of liability. For this reason demand is futile.

6      124.    However, if Defendant Levinson claims not to have known about these
7  materially misleading statements, then this failure is also a breach of fiduciary duty. Biofene
8  is a core product of Amyris. If Defendant Levinson did not know about these numerous
9  misleading statements about Biofene then he is liable for utterly abdicating his oversight
10 duties. Such pleas for "ostrich-like immunity" do not absolve Defendant Levinson or any of
11 the other Director Defendants of liability.

12      **H.    Demand is Futile As To All Directors For Additional Reasons**

13     125.    If Amyris's current officers and directors are protected against personal liability
14 for their breaches of fiduciary duties alleged in this Complaint by Directors &Officers
15 Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance
16 for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However,
17 Plaintiff is informed and believes that the D&O Insurance policies covering the Individual
18 Defendants in this case contain provisions that eliminate coverage for any action brought
19 directly by Amyris against the Individual Defendants, known as the "insured versus insured
20 exclusion." As a result, if the Director Defendants were to sue themselves or certain of the
21 officers of Amyris, there would be no D&O Insurance protection, and thus, this is a further
22 reason why they will not bring such a suit. On the other hand, if the suit is brought
23 derivatively, as this action is brought, such insurance coverage exists and will provide a basis
24 for the Company to effectuate recovery. Therefore, the Director Defendants cannot be
25 expected to file the claims asserted in this derivative lawsuit because such claims would not be
26 covered under the Company's D&O Insurance policy.

27

28                                   33
        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

126.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Amyris by prosecuting this action. Therefore, demand on Amyris and its Board is futile and is excused.

127.    Amyris has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against The Individual Defendants For Breach Of Fiduciary Duty

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants owed and owe Amyris fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Amyris the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

130.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

131.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Amyris has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**COUNT II**

2

**Against The Individual Defendants For Unjust Enrichment**

3    134.    Plaintiff incorporates by reference and realleges each and every allegation

4    contained above, as though fully set forth herein.

5    135.    By their wrongful acts and omissions, the Individual Defendants were unjustly

6    enriched at the expense of and to the detriment of Amyris.

7    136.    The Individual Defendants were unjustly enriched as a result of the

8    compensation they received while breaching their fiduciary duties owed to Amyris.

9    137.    Plaintiff, as a shareholder and representative of Amyris, seeks restitution from

10   Defendants and seeks an order from this Court disgorging all profits, benefits, and other

11   compensation obtained by the Individual Defendants from their wrongful conduct and

12   fiduciary breaches.

13   138.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

14

**COUNT III**

15

**Against The Individual Defendants For Waste of Corporate Assets**

16   139.    Plaintiff incorporates by reference and realleges each and every allegation

17   contained above, as though fully set forth herein.

18   140.    The wrongful conduct alleged regarding the issuance of false and misleading

19   statements, was continuous, connected, and on-going throughout the Relevant Period.  It

20   resulted in continuous, connected, and on-going harm to the Company.

21   141.    As a result of the misconduct described above, the Individual Defendants

22   wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination

23   payments to certain of its executive officers; (ii) awarding self-interested stock options to

24   certain officers and directors; and (iii) incurring potentially hundreds of millions of dollars of

25   legal liability and/or legal costs to defend Defendants' unlawful actions.

26   142.    As a result of the waste of corporate assets, the Individual Defendants are liable

27   to the Company.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

143.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## COUNT IV

**Against the Insider Selling Defendants for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    At the time the Insider Selling Defendants sold their Amyris stock, they knew the information described above, and sold Amyris stock on the basis of such information.

146.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Amyris stock.

147.    At the time of his stock sales, the Insider Selling Defendants knew that Amyris had received the FDA notice but had not yet disclosed the notice to the public. The Insider Selling Defendants' sales of stock while in possession and control of this material adverse, non-public information was a breach of his fiduciary duty of loyalty and good faith.

148.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits he obtained thereby.

149.    Plaintiff, on behalf of Amyris, has no adequate remedy at law.

## COUNT V

**Against the Insider Selling Defendants for Violation of Cal. Corp. Code § 25402**

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    At the time the Insider Selling Defendants sold their Amyris common stock, they were officers and/or directors of Amyris, positions which gave them access, directly or indirectly, to material information about Amyris not generally available to the public.

36

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    152.   The Insider Selling Defendants sold securities at a time when they knew
2   material information about Amyris – gained from their relationship with Amyris – which
3   would have significantly affected the market price of Amyris common stock and was not
4   generally available to the public.

5    153.   The Insider Selling Defendants knew these facts were not intended to be
6   available to the public. Had such information been generally available to the public, it would
7   have significantly reduced the market price of Amyris common stock.

8    154.   The Insider Selling Defendants had knowledge of material, adverse, non-public
9   information and sold their Amyris common stock in violation of California Corporations Code
10  § 25402.

11   155.   The Insider Selling Defendants are liable for damages in an amount up to three
12  times the difference between the price at which the security was sold and the market value
13  which the security would have had at the time of the sale if the information known to the
14  Insider Selling Defendants had been publicly disseminated prior to that time and a reasonable
15  time had elapsed for the market to absorb the information – pursuant to California
16  Corporations Code § 25502.5.

17   156.   On information and belief, Plaintiff alleges that Amyris has total assets in
18  excess of one million dollars and has a class of equity security held of record by 500 or more
19  persons.

20   157.   The Insider Selling Defendants are also liable for reasonable attorney's fees and
21  costs under California Corporations Code § 25502.5.

22  **X.   PRAYER FOR RELIEF**

23          WHEREFORE, Plaintiff demands judgment as follows:

24          A.    Against all of the Individual Defendants for the amount of damages sustained
25  by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust
26  enrichment, waste of corporate assets, and insider selling;

27

28

1    B.    Directing Amyris to take all necessary actions to reform and improve its
2    corporate governance and internal procedures to comply with applicable laws and to protect
3    Amyris and its shareholders from a repeat of the damaging events described herein, including,
4    but not limited to, putting forward for shareholder vote resolutions for amendments to the
5    Company's By-Laws or Articles of Incorporation and taking such other action as may be
6    necessary to place before shareholders for a vote the following corporate governance policies:

7              •    a proposal to strengthen the Board's supervision of operations and
8                   compliance with applicable state and federal laws and regulations;

9              •    a proposal to strengthen the Company's insider trading controls;

10             •    a proposal to strengthen the Company's internal reporting and financial
11                  disclosure controls;

12             •    a proposal to develop and implement procedures for greater shareholder
13                  input into the policies and guidelines of the Board;

14             •    a provision to permit the shareholders of Amyris to nominate at least
15                  two candidates for election to the Board;

16             •    a proposal to ensure the accuracy of the qualifications of Amyris's
17                  directors, executives and other employees;

18             •    a proposal to strengthen the Company's procedures for the receipt,
19                  retention and treatment of complaints received by the Company
20                  regarding internal controls; and

21             •    a provision to appropriately test and then strengthen the Company's
22                  internal operational control functions;

23   C.    Awarding to Amyris restitution from the Individual Defendants, and each of
24   them, and ordering disgorgement of all profits, benefits and other compensation obtained by
25   the Individual Defendants;

26   D.    Awarding to Plaintiff the costs and disbursements of the action, including
27   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

28
                                         38
                VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1       E.      Granting such other and further relief as the Court deems just and proper

2  **XI.    JURY DEMAND**

3       Plaintiff demands a trial by jury.

4

     Dated: August 8, 2013               Respectfully submitted,

5

6                               JOHNSON & WEAVER, LLP

7                               FRANK J. JOHNSON

                                SHAWN E. FIELDS

8

9                               SHAWN E. FIELDS

10                             110 West "A" Street, Suite 750

                               San Diego, California 92101

11                             Telephone: (619) 230-0063

                               Facsimile: (619) 255-1856

12

                             Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  39

## VERIFICATION

I, Steve Shannon, hereby verify that I am a shareholder of Amyris, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date:  7-29-2013

Steve Shannon